SAM JERNIGAN V. THE STATE.

No. 3819.  Decided November 10, 1915.

**1.—Rape—Female Under Age of Consent—Confession—Subscribing Witnesses.**

Where, upon trial of rape upon a female under the age of consent, defendant objected to the introduction in evidence of his written confession, there was no error in permitting the State to show that the confession was voluntarily made, and he having signed the same by his mark, in the presence of two witnesses, to also show that these persons were not peace officers.

**2.—Same—Sufficiency of the Evidence—Death Penalty.**

Where, upon trial of rape upon a female under the age of consent, the prosecutrix identified the defendant upon trial, but defendant insisted that the evidence did not unerringly point to him as the person who committed the crime, yet the written confession of the defendant was supported and corroborated by other testimony and circumstances, and the circumstantial evidence, when taken as a whole, and independent of defendant's confession. showed his guilt, the conviction assessing the death penalty, is sustained.

Appeal from the District Court of Trinity.  Tried below before the Hon. S. W. Dean.

Appeal from a conviction of rape on a female under the age of consent; penalty, death.

The opinion states the case.

No brief on file for appellant.

*C. C. McDonald,* Assistant Attorney General, and *J. A. Platt,* District Attorney, for the State.—On question of confession: Henzer v. State, 137 S. W. Rep., 1141; Harris v. State, 144 S. W. Rep., 232; Campbell v. State, 141 S. W. Rep., 334.

HARPER, JUDGE.—Appellant was convicted of rape on a girl under fifteen years of age, and his punishment assessed at death.

There are but three bills of exception in the record, all relating to the introduction of a purported confession of defendant, and the evidence offered to prove that it was voluntarily made, signed and witnessed as provided by law. The confession on its face alleges:

"I, Sam Jernigan, after being duly warned by J. A. Platt, District Attorney, 12th Judicial District of Texas, as follows:

"1. That I do not have to make any statement at all, and

"2. That any statement here made by me may be used in evidence against me upon the trial for the offense concerning which this statement is made, and being so warned by the said J. A. Platt, as aforesaid, do here make to the said J. A. Platt the following voluntary statement:" Then follows the confession, and it is signed by appellant, he making his mark, and was witnessed by C. Ansberer and Leon M. Siler. The defendant objected to the introduction of the confession, that defendant signed same by his mark, if at all, and that neither of the subscribing witnesses were called to testify how and under what circumstances the purported confession was signed; that it had not been properly shown that the subscribing witnesses were not peace officers. When these objections were made, Hon. J. A. Platt, district attorney, testified: "I was in Houston about the 28th of June, 1915. While in Houston I saw and conferred with the defendant, Sam Jernigan. I made a written statement at the request of Sam Jernigan. On that occasion I signed Sam Jernigan's name to a statement at his request; I signed the name and he touched the pencil and made the mark. I remember others being there. C. Ansberer was there; he represented that to be his name, and Leon M. Siler. They witnessed the signature. I asked them particularly in the presence of the defendant if they held any official position, and they said they did not. The defendant was there present. I saw them sign that instrument (indicating paper handed him by counsel). That is the name I signed at his request; he told me he couldn't write his name and I signed his name and he made his mark.

"When I started to leave the jail, Jernigan asked me when he would have his trial, something about when his trial would be. After writing this statement, I read it to him and warned him that he didn't have to make any statement, and that if he did make it, it would be used against him in evidence. It was read to him twice, and he was warned that he didn't have to make it. It was written down just as he told it. He made no objection to it. I asked him if he had anything to say, and he said yes, he wanted to tell how the thing happened, to tell the truth about it, and I told him he didn't have to make any statement, and that the statement might be used against him on trial, concerning the offense with which he was charged, and he went ahead and told me, and I got paper and told him to tell it slowly and I wrote it down as he told it, and when we got through I read the whole thing over."

Appellant objected to Mr. Platt being permitted to make this proof,

his contention apparently being that only the subscribing witnesses could be called to make such proof. The court did not err in over-ruling the objections made. If appellant desired Messrs. Ansberer and Siler as witnesses, he could have secured process for them. He does not allege nor contend that if present they would testify to any other state of facts than as testified to by Mr. Platt.

The State also called C. W. McPhail as a witness, and he testified "he was working for the City of Houston as city detective in the police department; that he was in Houston on the 28th of June, 1915; that he knew Leon M. Siler and C. Ansberer, and that they, Leon M. Siler and C. Ansberer, did not hold any official position in Houston or Harris County, and that he saw them, the said Siler and the said Ansberer, sign as witnesses the purported statement or confession of the defend-ant, Sam Jernigan." One of the three bills contends that the court erred in permitting the testimony of Mr. McPhail to be introduced; another that there was error in admitting the testimony of the district attorney, and the third, that there was error in admitting the confession. As before stated, these are the bills in the record, and they and neither of them present error. When appellant objected to the introduction of the confession in evidence, it then became necessary for the State to make proof of its execution by defendant, and that the provisions of article 810 of the Code of Criminal Procedure had been complied with, that is, that it was voluntarily made, that it was reduced to writing, and signed by him, and that he had been warned by the person to whom the confession was made that he did not have to make any statement, and that it would be used in evidence against him. Mr. Platt was the person to whom the confession was made, the person who reduced it to writing, and who knew better whether or not the warning had been given, as he had given the warning. It seems to us Mr. Platt was the proper person to make this proof. And as the statement was signed by mark, the law required that it be witnessed by some person other than a peace officer, therefore in order to meet the objection made, it was necessary to make the proof sworn to by Mr. McPhail, that neither of the subscribing witnesses were peace officers. There is other testimony in the record, both as to the fact that the subscribing witnesses were not officers, and that the statement was a voluntary one, and was signed by appellant, he making his mark.

This disposes of all questions in the record other than the one that the evidence is of that doubtful character and we should not permit the death penalty to be inflicted. There is and can be no question that the little girl was assaulted and penetrated. Appellant does not seek to dispute that fact. It is proven by the little girl, her mother and two physicians who examined her person, but appellant does insist that the evidence does not unerringly point to him as the person who committed the crime. If we should consider his confession, with the other evi-dence, this would be shown also beyond question. But appellant insists that the confession was obtained under such circumstances that we should give but little, if any, weight thereto, and that as many of the

statements in the confession are shown to be false, it bears the impress
that it was manufactured by appellant and he was induced to do so
by one Buddy Townes, who had an incentive to so do—that Buddy
Townes, in event he got a confession from defendant, would have two
criminal cases pending against him for violating the local option law
dismissed.   But independent of this confession, we think the evidence
unerringly points to appellant as the person who committed the crime.
The little girl testified: "My name is Rosa Vondra.   I am fourteen
years old.   I was fourteen years old the 8th of March, this year.   I
live on the farm, about five miles from Groveton.   My father's name
is Joseph Vondra.   About two months ago, about the 27th of May,
I was living at Kopiechek's.   I worked in the field with my father on
that day, about three miles from the house where my father lived.   I
quit working in the field that day about 1 o'clock.   When I quit
working that day I went and cut some weeds and went home.   Nobody
went home with me.   I left my father and mother in the field.   I took
a sack of weeds with me.   I went just a piece of the way near the rail-
road track in going home.   I just saw the train before I got home.
I did not meet anybody walking.   I didn't meet any negro.   I didn't
see any negro in the woods before I got home.   When I was going I
didn't see anybody until I got to that little creek, away from the rail-
road.   The negro asked where I lived and I said nothing.   He asked
me to come to him.   That was about a mile from the railroad.   The
negro had a gallon bucket in his hand.   He was dressed in blue over-
alls, blue shirt and raggedy black hat.   When he asked me to come to
him I did not do it; I ran—ran towards my folks.   I ran towards the
field where my folks were.   That was close to Piney Creek.   When I
ran the negro ran after me and caught me.   I would know that negro
if I were to see him.   I see him now.   (Witness points out defendant.)
This is the man here that ran after me.   He caught me and led me
to the woods.   I sat down and refused and he got me by the leg and
turned me over and got on me, rolled on top of me.   He put his pri-
vate parts in my private parts.   I hollered.   He tried to stop me from
hollering; he held my mouth with his hand.   He stayed on top of me
two or three minutes.   Somebody hollered in the woods near by and
that frightened him and he got up then.   Then I got up and ran towards
the field where my mother and father mere.   I went back to my mother
and father where they were at work in the field.   I told them what
had happened.   I first told my mother and my mother went to my
father and told him, and he quit his work and ran towards the negro
settlement there.   Q.   Did the negro, before he left you, ask you if
you were going to tell anybody?   A.   I would tell my mother and father.
I was going to tell my father.   This happened about two months ago.
The negro tore my clothes.   I tried to keep him from pulling me into
the woods.   I was catching hold of saplings and trees and he dragged
me.   He had a regular syrup bucket and there wasn't any lettering on
it.   This happened in Trinity County, State of Texas, about eight
miles from Groveton.   When he dragged me I was skinned on the back

and back of my ear. He bruised my lips by holding his hand over it. I didn't see the negro the next day or the next two days after that. I haven't saw him before or after. This is the negro (indicating defendant). I am quite sure it is him."

On cross-examination she was asked if on the day after the occurrence she had not failed to identify appellant. She testified: "I told Mr. Shupak that the clothes on that man they had there wasn't the clothes the man had on that made the assault on me. He didn't look like him, except in the face; he didn't look as large, but after I come to think about it, it come to my mind that he was the nigger "

The appellant called Shupak as a witness, and he testified that they carried appellant out to where the little girl was stopping and he called for her, and he says when she first saw him she said, "That looks like him," and he·told her to come closer and look good, and she did so, and said it looked like him in the face, but he did not have on clothes like the one who assaulted her; she said it was not the clothes, but identified the hat as the one worn by the person who assaulted her. It was a black ragged hat. She said the person who assaulted her looked bigger and taller, and said she would not be sure whether he was the person or not. .Others present can only testify to what Shupak told them, because the conversation was carried on between Shupak and Rosa in the Polish language. This is the extent it was sought to break down her positive identification on the trial, and if this was all the testimony, it might be said to render the identification a little uncertain. But it will be noticed that the little girl testified to the assault taking place near the railroad and Piney Creek, and fixes the time shortly after the train had passed. Joe White testified he was a brakeman on this train, and saw a girl at the point testified to by Rosa; that appellant was on the train at this time, and he saw him get off the train about a quarter of a mile this side of Piney Creek and go back in the direction he saw the little girl; that appellant said he was going to pick some berries. Ed Williams testified he was on the train; saw appellant on the train, and saw him get off the train; that he had blue overalls, a shirt and black hat on. It was a ragged looking hat. That appellant got off the train about a quarter of a mile this side of Piney Creek; that he had a bucket, and said he was going to pick a few berries. Other witnesses also so testified, and place appellant and the little girl at and near the point where the rape occurred, and no other person is seen there or near there. G. W. McGraw says he was on Piney Creek fishing the day the little girl was assaulted. That he saw appellant in Piney Creek bottom that day; that he heard a scream, and soon thereafter he saw the negro in the bottom, and saw him turn to the left and jump the creek. That when he heard the scream he hollered back. The little girl testified that when someone was heard the negro got off of her and ran. Thus by all the testimony, other than her own and appellant's confession, the little girl is shown to be at this point and was ravished. Appellant is the only negro the evidence places at or near this place; a scream is heard and he is seen

running away, coming from the direction where the crime was com-mitted.

There is no testimony that he was at any other or different place, ·and if the little girl had not identified appellant positively on the trial, and no confession. was introduced, but she had described the man as she did describe him on this and all other occasions, with the other evidence in the case, it would amply support the verdict.

The judgment is affirmed.

*Affirmed.*